**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| ROBERT MARTIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Docket no. 2:21-cv-00102-GZS |
| | ) |
| NATIONAL GENERAL INSURANCE | ) |
| COMPANY and INTEGON NATIONAL | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendants. | ) |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Before the Court is a Motion for Summary Judgment by Defendants National General Insurance Company and Integon National Insurance Company (ECF No. 19).  In the Motion, Defendants argue that a Maine statute of limitations applicable to foreign insurers violates the Dormant Commerce and Equal Protection Clauses of the U.S. Constitution.  Having reviewed the Motion and the subsequent briefing filed by the parties (ECF Nos. 21, 23, 27, 34 & 35), the Court DENIES the Motion.

## I.  LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.  <u>See</u> <u>Santoni v. Potter</u>, 369 F.3d 594, 598 (1st Cir. 2004).  "[S]ummary

judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." <u>Morales-Melecio v. United States (Dep't of Health and Hum. Servs.)</u>, 890 F.3d 361, 368 (1st Cir. 2018) (internal quotation marks omitted).

Here, Defendants move for summary judgment on purely legal grounds prior to the commencement of discovery. The parties have provided the Court a Joint Statement of Material Facts ("JSMF") (ECF No. 17) as well as a Joint Stipulated Record ("JSR") (ECF Nos. 18–18-8), which the Court uses to construct the factual narrative that follows.[1]

## II.    BACKGROUND

Defendant National General Insurance Company ("NGIC") provided a homeowner's insurance policy ("Policy"), underwritten by Defendant Integon National Insurance Company, to Plaintiff Robert Martin.[2]   (<u>See</u> JSMF, PageID # 128.)   The Policy's coverage extended from January 6, 2017, through January 6, 2018.  (<u>Id.</u>)  A condition of the Policy specifies that "[n]o action can be brought against [NGIC] unless there has been full compliance with all the terms under Section I of th[e] [P]olicy and the action is started within two years after the date of loss." (JSR, PageID # 153.)

On March 4, 2017, a water pipe froze and burst in Martin's home, causing damage to the home and its contents. (JSR, PageID # 184.)  That same day, Martin filed a coverage claim with NGIC. (JSMF, PageID # 128.)  NGIC's claims adjuster ultimately prepared for Martin two proofs of loss:  an April 21, 2017 proof of loss for the damaged contents of Martin's home, and a May

---

[1] In compliance with Local Rule 56, the State filed a Supplemental Statement of Material Facts, which draws from the JSR. <u>See</u> State Supplemental SMF (ECF No. 22).  In their response to the Supplemental SMF, NGIC and Integon admitted each of the facts listed. <u>See</u> Resp. to State Supplemental SMF (ECF No. 26).  The Court's factual recitation includes these admitted facts to the extent that they are material to the resolution of Defendants' Motion.

[2] For purposes of this Order, the Court generally refers to both NGIC and Integon collectively as "NGIC."

18, 2017 proof of loss for damage to Martin's home itself.  (See JSR, PageID #s 187–88 & 189–90.)  The proofs of loss specified that NGIC would compensate Martin $13,070.97 for contents damage and $225,840.01 for home damage, sums that reflected the "Actual Cash Value" of Martin's losses.  (See id., PageID #s 187 & 189.)  NGIC paid these amounts on April 25, 2017, and May 23, 2017.  (See id., PageID # 206.)  Pursuant to the Policy, Martin would be entitled to claim a further $8,099.82 for contents and $36,393.02 for the home as "Recoverable Depreciation" upon furnishing proof that he had replaced the contents and completed repairs to the property.  (See id., PageID #s 152, 187 & 189.)  A subsequent letter from Martin's attorney, described below, acknowledges receipt of $5,000 from NGIC (not reflected in either proof of loss) for mold damage.  (See id., PageID #192.)  This amount represents the Policy's coverage limit for mold damage.  (See id., PageID #133.)

The next interaction between NGIC and Martin took place on March 1, 2019, when Martin's attorney sent a Supplemental Demand for Coverage to NGIC.  (See id., PageID #s 192–99.)  The Supplemental Demand requested an additional $153,255.37 from NGIC:  the Recoverable Depreciation amounts described above, plus an additional $42,512.40 for contents damage, $10,717.41 for home damage, and $55,532.72 for mold damage.  NGIC responded on March 4, 2019, confirming receipt and informing Martin's attorney that it would review the Supplemental Demand within thirty days.  (See id., PageID #201.)

Ten days later, on March 14, 2019, NGIC responded to the substance of Martin's Supplemental Demand.  (See id., PageID # 200.)  NGIC expressed concern about Martin's delay in communicating his additional loss amounts.  NGIC then denied Martin's additional claim for mold damage, but agreed to consider certain contents damage claims.  A final loss summary shows that NGIC made one additional payment in response to Martin's Supplemental Demand.  The

additional payment, for $40,712.92, consisted of $36,393.02 in Recoverable Depreciation for the home damage and $4,319.90 for Martin's pinball machine and pool table. (See id., PageID # 206.)

Martin filed suit in Cumberland County Superior Court on March 4, 2021, alleging claims of breach of contract, negligence, and unfair claims settlement practices under Maine law. NGIC then removed the action to this Court. Thereafter, the Maine Attorney General and Maine Superintendent of Insurance (collectively, the "State") jointly exercised their statutory right to intervene under 28 U.S.C. § 2403(b). In April 2021, NGIC notified the Court that it wished to move immediately for summary judgment on a singular issue: "whether 24-A M.R.S.A. § 2433 violated the dormant Commerce Clause given its disparate treatment of foreign insurers such as Defendant." (Def. Pre-Conference Mem. (ECF No. 11), PageID # 112.) Both Martin and the State opposed NGIC's suggestion that this case be resolved at this early stage of the litigation.

## III.    DISCUSSION

In this case, Plaintiff asserts that a state statute overrides and prevents Defendants from enforcing the Policy's suit-limitation provision, which requires the insured to commence any action "within two years after the date of loss." (JSR, PageID # 153.) The state statute in question provides,

> No conditions, stipulations or agreements in a contract of insurance shall deprive the courts of this State of jurisdiction of actions against foreign insurers, or limit the time for commencing actions against such insurers to a period of less than 2 years from the time when the cause of action accrues.

24-A M.R.S.A. § 2433. The parties agree that NGIC and Integon are "foreign insurers" within the statute's meaning. (See JSMF, PageID # 128.) Defendants assert that while this statutory language appears to make Plaintiff's suit timely, the Policy's suit-limitation provision would bar Plaintiff's

breach-of-contract claim and associated negligence and unfair practices claims.[3]  Thus, Defendants ask this Court to declare that section 2433 is unconstitutional, invoking both the Dormant Commerce Clause and the Equal Protection Clause.  The Court first turns its attention to the anticipated Dormant Commerce Clause argument.

### a. Dormant Commerce Clause

Defendants argue that Maine's statute of limitations for foreign insurers unconstitutionally discriminates between domestic and foreign insurers in violation of the Dormant Commerce Clause.

The Constitution grants the Congress the power to "regulate Commerce . . . among the several States." U.S. Const., art. I, § 8.  "The Supreme Court has interpreted this affirmative grant of authority to Congress as also establishing what has come to be called the Dormant Commerce Clause—a self-executing limitation on state authority to enact laws imposing substantial burdens on interstate commerce even in the absence of Congressional action." United Egg Producers v. Department of Agric. of P.R., 77 F.3d 567, 569–70 (1st Cir. 1996) (quoting South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87 (1984)).  However, "Dormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue[.]" Tennessee Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2465

---

[3] It is not clear whether partial summary judgment in Defendants' favor on the constitutionality of Maine's law would affect Martin's negligence claim, even if it might bar his claim for breach of contract and unfair trade practices.  See Pendleton Yacht Yard, Inc. v. Smith, No. Civ. A. CV-01-047, 2003 WL 21714927 (Me. Sup. Ct. Mar. 24, 2003) ("[W]hile normally a mere breach of contract is not actionable as a tort, the circumstances surrounding the contract may give rise to an independent duty to exercise due care or similar duty in tort, in which case a breach may be actionable under both tort and contract theory." (internal quotation marks omitted)); Chapman v. Standard Fire Ins. Co., No. 1:11–cv–459–DBH, 2012 WL 3644778, at *3 (D. Me. Aug. 23, 2012) (interpreting Maine Law Court precedent to hold that the unfair claims settlement statute merely provides alternative remedies for a breach of contract).  In any event, it is unnecessary to adjudicate the relationship among Plaintiff's claims here because the Court denies Defendants' Motion.

(2019).  In exercising its regulatory power over interstate commerce, Congress may "redefine the distribution of power over interstate commerce by permitting the states to regulate the commerce in a manner which would otherwise not be permissible."  United Egg Producers, 77 F.3d at 570 (1st Cir. 1996) (quoting Wunnicke, 467 U.S. at 88).

The McCarran-Ferguson Act ("Act"), which removes Dormant Commerce Clause limitations on the states' regulatory power over the "business of insurance," is an example of Congress permitting otherwise impermissible state regulation.  See 15 U.S.C. § 1012(a); U.S. Dep't of Treasury v. Fabe, 508 U.S. 491, 500 (1993) (The McCarran-Ferguson Act "remov[es] obstructions which might be thought to flow from Congress' own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation." (internal alteration omitted) (citing Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 429–30 (1946))).  The relevant provision of the Act states, "The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business."  15 U.S.C. § 1012(a).

At least three criteria are relevant in determining whether a practice regulated by state law—here, the inclusion of suit-limitation provisions in insurance contracts—is part of the "business of insurance":  "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry."  Union Lab. Life Ins. Co. v. Pireno, 458 U.S. 119, 129 (1982) (internal emphasis omitted) (citing factors first announced in Group Life & Health Ins. Co. v. Royal Drug

Co., 440 U.S. 205 (1979)).[4]  A state law need not satisfy all three factors to qualify for McCarran-Ferguson protection.  UNUM Life Ins. Co. of America v. Ward, 526 U.S. 358, 373 (1999).  At their core, the factors aim to identify whether the practice at issue closely relates to the "relationship between the insurance company and its policyholders," which is the Act's primary focus.  See Fabe, 508 U.S. at 501.  "The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these [are] the core of the 'business of insurance.'"  SEC v. National Secs., Inc., 393 U.S. 453, 460 (1969).

In light of these precedents and the Pireno/Royal Drug factors, the Court finds that Maine's statute of limitations for foreign insurers falls within the scope of the McCarran-Ferguson Act and thus is immune from challenge on Dormant Commerce Clause grounds.  The first factor adds little to the analysis in this case.  "The transfer of risk from insured to insurer is effected by means of the contract between the parties—the insurance policy—and that transfer is complete at the time that contract is entered."  Pireno, 458 U.S. at 130.  Because the statute of limitations becomes relevant only after an insurance contract is formed, Maine's statute of limitations for foreign insurers cannot be said to affect the transfer of risk directly.

The second and third factors, however, strongly support the conclusion that the McCarran-Ferguson Act shields Maine's longer statute of limitations for foreign insurers from Dormant Commerce Clause attack.  The length of time in which an insured may bring suit against an insurer to claim benefits is an "integral part" of the enforcement of the contract between the parties, and

---

[4] Precedent interpreting the term "business of insurance" within the McCarran-Ferguson Act does so in the context of the Act's second provision, which is not relevant to this case.  Nevertheless, following the First Circuit's lead, this Court treats the precedential gloss on 15 U.S.C. § 1012(b) as directly applicable to section 1012(a).  See United States v. Rhode Island Insurers' Insolvency Fund, 80 F.3d 616, 622 n. 4 (1st Cir. 1996) (applying the statutory interpretation canon that the "same word or phrase used repeatedly in [a] statute is presumed to have [the] same meaning" to the McCarran-Ferguson Act's two-time use of the phrase "business of insurance").

insurance policy enforcement lies at the heart of the Act's protective ambit.  See Pireno, 458 U.S. at 129; National Secs., 393 U.S. at 460.  Furthermore, in Fabe, the Supreme Court held that state laws guaranteeing claim priority to insureds in liquidation proceedings against their insurers were "close enough to enforcement of the original contract to qualify for McCarran-Ferguson protection." Ruthardt v. United States, 303 F.3d 375, 382 (1st Cir. 2002).  It follows, a fortiori, that Maine's law, which is designed to give insureds additional time in which to sue for the benefits of their own insurance policies, is likewise entitled to McCarran-Ferguson protection because it directly regulates enforcement of the insurance contract.

As to the third factor, Maine's foreign-insurer statute of limitations is explicitly confined to entities within the insurance industry.  Section 2433 appears in a chapter of the Maine Insurance Code that "applies as to all insurance contracts and annuity contracts, other than [reinsurance, out-of-state contracts, and marine insurance]." 24-A M.R.S.A. § 2401.  Application of the second and third Pireno factors confirms that Maine's law regulates the "core" of the "business of insurance": the enforcement of an insurance contract between insured and insurer.  See National Secs., 393 U.S. at 460.

To qualify for McCarran-Ferguson Act protection, a state law must "relate to" the regulation of the business of insurance.  "Relate to" is a term with a "broad common-sense meaning," denoting a "connection" or "reference to" something else.  Barnett Bank of Marion Cnty., N.A. v. Nelson, 517 U.S. 25, 39 (1996) (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47 (1987)).  A statute of limitations applicable to foreign insurers straightforwardly connects or refers to the business of insurance, as defined above.  "Statutes aimed at protecting or regulating th[e] relationship [between insurer and insured] are laws regulating the 'business of insurance.'" National Secs., 393 U.S. at 460.  Thus, the Court concludes that Maine's foreign-insurer statute of

limitations falls within the ambit of the McCarran-Ferguson Act's protection, and so Defendants' challenge to it as a violation of the Dormant Commerce Clause fails.[5]

### b. Equal Protection Clause

In addition to claiming unconstitutionality under the Dormant Commerce Clause, Defendants argue that Maine's foreign-insurer statute of limitations violates the Equal Protection Clause. Defendants first raised this argument in their Reply (ECF No. 27), as they themselves acknowledge. (See Defs. Reply (ECF No. 27), PageID # 289 n.5.) On distinct grounds, Plaintiff and the State urge the Court not to consider the argument: because it violates a District of Maine Local Rule and because the doctrine of constitutional avoidance requires the result. See D. Me. Loc. R. 7(c) ("[T]he moving party may file a reply memorandum . . . which shall be strictly confined to replying to new matter raised in the objection or opposing memorandum."); (State's Sur-Reply (ECF No. 35), PageID # 323.).

In the Court's view, resolution of Defendant's Equal Protection challenge would be premature at the current stage of the litigation. See Matal v. Tam, 137 S. Ct. 1744, 1755 (2017) ("[I]t is important to avoid the premature adjudication of constitutional questions, . . . and [courts] ought not to pass on questions of constitutionality unless such adjudication is unavoidable[.]" (internal quotation marks and alterations omitted)). Plaintiff has raised issues of waiver and estoppel that may render adjudication of the constitutionality of Maine's law moot. (See Pl. Resp. (ECF No. 21), PageID # 242.) Even Defendants appear to acknowledge that further discovery

---

[5] The State urges the Court to decline to address Defendants' Dormant Commerce Clause challenge because the case might be resolved on alternative grounds. See State's Resp. (ECF No. 23), PageID #s 262–71; Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."). As Defendants' Dormant Commerce Clause claim is resolved through statutory interpretation, the Court concludes that constitutional avoidance is not implicated in its analysis.

would assist them in fleshing out their Equal Protection claim.  (<u>See</u> Defs' Reply, PageID # 293 n. 5.)  Because resolution of factual issues may yet be dispositive of Plaintiff's claims, adjudication of the constitutional Equal Protection issue is not unavoidable at this point in time.  Accordingly, under the constitutional avoidance principles announced by the Supreme Court, Defendants are not entitled to judgment as a matter of law.  <u>See</u> <u>Tam</u>, 137 S. Ct. at 1755.  The Court thus concludes that Defendants' Equal Protection Clause argument is best reserved for resolution on a more developed factual record.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' Motion for Summary Judgment (ECF No. 19).  This denial is with prejudice as to Defendants' Dormant Commerce Clause argument, and without prejudice as to Defendants' Equal Protection Clause argument.  By November 30, 2021, the parties shall submit to the Court a proposed Amended Scheduling Order.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 9th day of November, 2021.